# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MERCEDES-BENZ USA LLC,**
                    **Plaintiff,**

      **v.**                                                            **Case No.  07-C-0389**

**CONCOURS MOTORS, INC.,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Mercedes-Benz USA, LLC ("MBUSA"), a distributor of Mercedes-Benz vehicles, brings this diversity action against defendant Concours Motors, Inc. ("Concours"), one of its dealers, alleging that Concours breached an agreement to improve its facilities. MBUSA also brings a promissory estoppel claim.  Concours has asserted numerous counterclaims against MBUSA that arise under state and federal law, all of them alleging that MBUSA treated Concours unfairly.  The parties have filed cross-motions for summary judgment, which I address below.

## I.  BACKGROUND

MBUSA is the importer and distributor of new Mercedes-Benz brand passenger cars and light trucks in the United States.  Concours is a franchised dealer of MBUSA and has been for over forty years.  During that time, Concours has sold and serviced Mercedes vehicles from its facility located in Glendale, Wisconsin.  In addition to Mercedes-Benz vehicles, Concours sells and services other lines of vehicles from its Glendale location.

Throughout most of their forty-year relationship, the parties operated under five-year written dealership agreements.   In June 2002, however, as Concours' most recent five-

year agreement was expiring,[1] MBUSA informed Concours that it thought its sales performance was deficient and that it would therefore not be offering Concours a new five-year agreement. Instead, MBUSA offered Concours a one-year extension of its agreement and told Concours that its performance would be reevaluated at the end of 2002. MBUSA included a "Dealer Improvement Addendum" with the extension, and this addendum required Concours to meet certain regional sales averages by December 31, 2002. (Beilfuss Aff. [Docket Entry #118] Exs. 230 & 231.) Although Concours was not pleased with MBUSA's decision and did not agree that its sales were deficient, Concours accepted the one-year extension and signed the improvement addendum.

Concours did not meet the performance objectives specified in the addendum by the end of 2002. On April 3, 2003, MBUSA notified Concours that it had 180 days to cure its failure to meet the performance objectives or it faced possible termination. In the same letter, MBUSA offered to renew the dealership pursuant to another one-year extension, although it reserved its right to terminate the dealership if the performance deficiencies were not cured. MBUSA also suggested that Concours might want to consider selling its dealership to a different franchisee. Over the course of 2003, MBUSA sent further letters to Concours about its sales performance.

On August 8, 2003, MBUSA began a discussion about the adequacy of Concours' Glendale location. MBUSA noted that the Glendale location was in compliance with the minimum facility requirements of the dealer agreement but asked Concours to consider

---

[1]The parties' relationship was actually governed by two different dealership agreements – one for passenger cars and one for light trucks – but for purposes of simplicity I will treat these two agreements as a single agreement.

Case 2:07-cv-00389-LA    Filed 01/04/10    Page 2 of 33    Document 140

whether its current facility was adequate to support the growth in sales that MBUSA anticipated over the next few years. MBUSA thought that Concours could better represent the brand by operating out of a facility devoted exclusively to the sale of Mercedes-Benz vehicles, rather than out of its multi-line facility.

On October 10, 2003, MBUSA sent Concours a report analyzing the amount of facility space that MBUSA thought Concours would need in order to support sales of Mercedes-Benz vehicles through 2007. In the cover letter to that report, MBUSA referenced a conversation it had with Concours earlier in the week about Concours' "intention to build an exclusive Mercedes-Benz dealership" in Glendale. (Beilfuss Aff. [Docket Entry #118] Ex. 24.) Neither party identifies any evidence in the record describing what Concours' "intentions" were at that point.

On November 11, 2003, MBUSA sent another letter to Concours regarding the performance standards specified in the Dealer Improvement Addendum. MBUSA stated that it was still not satisfied with Concours' performance and that it planned to meet with Concours to discuss whether it would be offered another one-year extension. In the same letter, MBUSA again referenced its conversation with Concours in October regarding the construction of an exclusive Mercedes-Benz facility. MBUSA stated that if it extended Concours' dealership for another year despite Concours' poor sales, MBUSA expected that the construction timeline for the new facility would be concurrent with the one-year extension. MBUSA stated that once the project was complete, it would offer Concours a five-year dealership agreement.

In December 2003, MBUSA offered Concours another one-year extension of its dealership agreement. MBUSA attempted to include in the renewal agreement a

3

requirement that Concours build an exclusive Mercedes-Benz facility by July 1, 2005.

Upon receipt of the renewal agreement, Concours sent MBUSA a letter, dated December

19, 2003, explaining its reaction to the proposed dealership agreement and the

requirement that it build a new facility. Concours noted that the facility provisions of the

agreement did not explain what MBUSA meant by an "exclusive" facility and that the

proposed construction timetable was not realistic. Concours then made an alternative

proposal:

> While we are willing to agree that it would be desirable to substantially upgrade our facility, working with Mercedes-Benz toward that end should not be part of the existing Dealer Agreements. . . . Rather than include a facility provision in the Dealer Agreements, we suggest that we enter into a side letter, a copy of which I have enclosed, that would outline our intent and plans to work together to develop a new facility. . . .

(Wuestoff Aff. [Docket Entry #97] Ex. A.) The "side letter" is reproduced below:

December 19, 2003

Mr. Robert Woerner
Business and Franchise Development Manager
Mercedes-Benz USA, LLC
9399 West Higgins Road
Suite 210
Rosemont, IL 60018

RE:     Concours Motors, Inc. Mercedes-Benz Facility

Dear Mr. Woerner:

Concours Motors believes that it is desirable to develop a larger and more exclusive facility from which to sell Mercedes-Benz Products.

Concours Motors will commit to make a substantial capital investment to improve and expand its facility, or build a new one at a different location. We understand that Mercedes wishes to create a facility that would be separate and distinct from other dealerships we operate and which would contain a level of finish and ambience consistent with the high-end nature of the Mercedes product. In particular, a new facility would have to meet the minimum space requirement set forth in the attached Mercedes-Benz AOI Space Analysis for the year 2008.

4

In order to work toward and successfully develop that type of facility, we propose that Concours and Mercedes-Benz work together in accordance with the following schedule:

1.      On or before June 30, 2004, Concours will present definitive plans for a new facility that complies with the 2008 space requirements. During that period MBUSA agrees to promptly review and provide feedback to Concours on various location and facility options presented such that Concours can develop the final plans at a specific location on or before that date.

2.      By September 30, 2004, Concours shall have secured, at least by way of option to purchase, any property that may be necessary to meet the facility requirements and the final plans.

3.      On or before June 5, 2005, Concours shall have obtained all necessary zoning and land use approvals for the new facility.

4.      On or before September 30, 2005, Concours shall have secured all necessary building and construction plan approvals.

5.      On or before December 31, 2005, Concours shall have commenced construction on the facility.

6.      On or before December 31, 2006, the new facility shall be open for business.

Upon Concours' securing any necessary site location as described in Item 2 above, Mercedes shall, assuming compliance at that time with all requirements of the Passenger Car and Light Truck Dealer Agreements extend Concours Dealership Agreement through calendar year 2005.

Assuming Concours meets the requirement in Item 5 above, and assuming compliance at that time with all terms of the Passenger Car and Light Truck Dealer Agreements, Mercedes-Benz shall provide Concours with a 5 year agreement which shall include the ability to distribute all Mercedes-Benz product then being offered by Mercedes-Benz USA.

During the course of this time frame, it will, of course, be necessary that you promptly review, evaluate and respond to our proposals and the options presented so that we arrive at plans which serve our mutual interests.

5

Assuming the foregoing is acceptable to you, please sign the enclosed copy of this letter and return it to me.

We look forward to working with together with Mercedes-Benz on this exciting project.

Very truly yours,

CONCOURS MOTORS, INC.

William E. Weusthoff
Chairman of the Board

The foregoing is accepted and agreement to this _26_ day of _August_, 2005

MERCEDES-BENZ USA, LLC

By: _____
Robert Woerner
Business and Franchise Development Manager

(Wuestoff Aff. [Docket Entry #97] Ex. A.)

Ultimately, MBUSA agreed to extend Concours' dealership through 2004 and did not require that provisions relating to the new facility be incorporated into the dealer agreement. However, MBUSA did not immediately sign the side letter. Nonetheless, Concours and MBUSA began working towards the construction of a new Mercedes-Benz facility in rough accordance with the timetable established by the side letter. By the beginning of 2004, Concours had located a site for the new facility in Brown Deer, Wisconsin. In April 2004, after MBUSA approved the site, Concours wrote an offer to purchase it, and the transaction closed on October 15, 2004. Concours then hired

6

architects to redesign an existing facility on the Brown Deer site in accordance with MBUSA's specifications. Thereafter, MBUSA extended Concours' dealership through 2006. By October 6, 2005, Concours had obtained the necessary zoning and land use approvals for the new facility.

As this progress was being made, however, two problems arose. First, Concours learned that MBUSA had been encouraging another of its dealers, International Autos, to construct a third Mercedes-Benz dealership in the Milwaukee area. International Autos already operated one dealership in the Milwaukee area, located in West Allis, but MBUSA wanted it to open a second dealership, located in Waukesha County. Concours first learned about this dealership on June 10, 2004, when MBUSA sent Concours a letter explaining the impact that it expected the new dealership would have on Concours' sales. This letter arrived after Concours had made its offer to purchase the Brown Deer location but before closing and apparently before Concours hired architects to design the new Mercedes-Benz facility. Upon learning of the third Milwaukee-area dealership, Concours did not immediately stop working on its own new facility. As noted, Concours continued with its plans until at least October 2005, when it secured the necessary zoning and land use approvals.

The second problem that arose during the planning of the Brown Deer facility was MBUSA's new sales projections. In March 2005, MBUSA projected that Concours would make 25% fewer sales in 2010 than it would make in 2007 or 2008. On April 22, 2005, MBUSA informed Concours that, as a result of these new projections, the Brown Deer property was bigger than it needed to be. By the time it received the new sales projections, however, Concours had already purchased the Brown Deer property. Concours decided

7

that it could not rescind the purchase of the Brown Deer property without incurring significant liability, and therefore it continued with its plans to construct the new facility.

In mid-to-late 2005, however, MBUSA engaged in actions indicating that it had some concerns about Concours' commitment to the new facility. First, on August 26, 2005, MBUSA signed the acknowledgment line of the side letter and returned it to Concours. MBUSA explains that its delay in signing the letter was the result of an oversight, while Concours argues that this was an attempt by MBUSA to turn the side letter, which was merely a list of discussion points, into a binding contract. Second, in October 2005, MBUSA sent a new Dealer Improvement Addendum to Concours. The addendum stated that Concours' Glendale facilities were not in compliance with the dealer agreement and required Concours to complete the Brown Deer facility by December 31, 2006.

In a letter dated October 6, 2005, Concours informed MBUSA that it would not sign the Dealer Improvement Addendum and pointed out that its Glendale facilities complied with all provisions of the dealer agreement. The letter also reminded MBUSA of the progress Concours had made towards construction of the new facility in accordance with the side letter. Concours also stated that it had "commenced construction" of the new facility and that, therefore, MBUSA was obligated, pursuant to Item 5 of the side letter, to grant Concours a five-year dealer agreement.[2] (Kelso Decl. [Docket Entry #122] Ex. 20.) Finally, the letter listed various conditions (which need not be recounted here) that Concours expected MBUSA to satisfy before Concours would proceed any further with the

_____

[2]In fact, Concours had not commenced construction. However, it believed that because the Brown Deer site came with an existing structure that Concours planned to remodel, it had, in essence, commenced construction of the new facility.

8

new facility.

At some point after sending this letter, Concours decided to abandon its plans to build a stand-alone Mercedes-Benz facility, either in Brown Deer or elsewhere, and it sold the Brown Deer property. Concours states that its decision was based on the discovery of the new International Autos dealership and MBUSA's new sales projections.

MBUSA was upset with Concours' decision to abandon the stand-alone facility and informed Concours that its refusal to build the facility was grounds for termination of the dealership. Nonetheless, MBUSA did not terminate Concours' dealership and Concours continues to operate as an MBUSA dealer to this day. However, MBUSA has not offered Concours a new five-year dealership agreement, and the last written agreement between the parties expired on December 31, 2006. Since that time, Concours has been operating without a written dealership agreement pursuant to what Concours describes as an implied oral agreement that mirrors the terms of the expired written agreements. No evidence in the record suggests that the lack of a written agreement has had any impact on the day-to-day operation of Concours' dealership.

In 2007, MBUSA filed this lawsuit against Concours, alleging that Concours breached the side letter by failing to complete the stand-alone Mercedes-Benz facility by December 31, 2006. It seeks specific performance of the side letter – that is, a decree ordering Concours to complete the facility. Concours denies that the side letter is an enforceable contract, and it has filed counterclaims alleging that various actions by MBUSA were unfair and taken in bad faith.

9

## II.  DISCUSSION

MBUSA has moved for partial summary judgment on its breach of contract claim. It contends that summary judgment is appropriate on two issues: whether the side letter constitutes a contract, and if so, whether Concours breached it.  Concours has moved for summary judgment on MBUSA's breach of contract claim in its entirety, asserting that the side letter was not a contract and that, even if it was, specific performance is an inappropriate remedy.  MBUSA has also moved for summary judgment on all of Concours' counterclaims.  I first address MBUSA's contract claim and then turn to Concours' counterclaims.  I may grant a motion for summary judgment only if the moving party establishes that "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

### A.    MBUSA's Breach of Contract Claim

MBUSA contends that the December 19, 2003 side letter created an enforceable contract requiring Concours to have opened a new, exclusive Mercedes-Benz facility by December 31, 2006, and that Concours' failure to do so was a breach of the side letter. MBUSA has waived any right to damages for this breach (Tr. of Oral Arg. [Docket Entry #139] at 41:3 - 41:13)  and contends that the appropriate remedy is specific performance. As explained below, I conclude that Concours did not breach the side letter and that, even if it did, specific performance would not be an appropriate remedy.[3]

---

[3]Although Concours occasionally cites New Jersey cases in connection with MBUSA's contract claim, the parties have largely applied Wisconsin contract law and Concours does not argue that New Jersey law is applicable.  Thus, I apply Wisconsin substantive law to MBUSA's breach of contract claim.  See, e.g., Camp v. TNT Logistics

As noted, when MBUSA included provisions in the proposed 2004 dealer agreement requiring Concours to construct a new facility, Concours objected. As an alternative to immediately committing to the construction of a new facility, Concours proposed that the parties "work toward" the development of such a facility in accordance with a suggested timetable. (Side Letter, third paragraph.) The timetable was structured so that as Concours passed certain benchmarks, corresponding obligations on the part of MBUSA would be triggered. For example, once Concours secured the site for the new facility, MBUSA was obligated to extend Concours' dealership through 2005. Likewise, once Concours commenced construction of the new facility, MBUSA was required to grant Concours a five-year dealership.

By using this "if-then" structure, the parties were not committing themselves to the completion of any of these tasks but were expressing their respective obligations, which would arise as various stages of the project were successfully completed. Indeed, although the letter proposed that Concours would commence construction of the new facility by December 31, 2005, a later provision indicates that the parties contemplated that construction might never begin. (<u>See</u> Side Letter, fifth paragraph ("<u>Assuming</u> Concours [commences construction of the facility and meets certain other obligations] . . ., [MBUSA] shall provide Concours with a 5 year agreement . . . .") (emphasis added).) Further, the side letter explains that the project would be contingent on MBUSA evaluating and approving Concours' plans for the facility. (Side Letter, Item 1 & sixth paragraph.) This shows that the parties had yet to agree on the details of the new facility, and implies that,

_____

<u>Corp.</u>, 553 F.3d 502, 505 (7th Cir. 2009) (where parties do not raise a choice of law issue, district court sitting in diversity applies substantive law of forum state).

had MBUSA insisted on a facility requiring construction costs in excess of what Concours was willing to spend, Concours would have been free to walk away from the project. Essentially, then, the side letter could be described as an enforceable contract, but its terms did not require that Concours construct a new facility. Instead, the side letter was an agreement on certain incentives designed to encourage Concours to construct the facility. See Cent. Ill. Light Co. v. Consol. Coal Co., 349 F.3d 488, 491-92 (7th Cir. 2003) (Illinois law) (noting that parties can enter into binding preliminary agreements regarding the essentials of a deal and leave the details to be worked out in subsequent agreements).

MBUSA's conduct following the transmission of the side letter confirms that it understood that Concours had not yet committed to construct the new facility. First, on January 5, 2004, MBUSA signed a confidentiality agreement designed to keep all information pertaining to the construction project (such as potential locations, architectural designs, and the like) confidential. The recitals to this agreement did not say that Concours had agreed to construct the new facility, but rather that the parties were "discussing the establishment of a more exclusive Mercedes-Benz dealer facility." (K. Wuesthoff Aff. [Docket Entry #116] Ex. A.) Second, in 2005, MBUSA sent Concours the proposed addendum to the dealer agreement (which Concours rejected) that called for Concours to make an absolute commitment to constructing a new facility on the Brown Deer site by December 31, 2006. Had MBUSA believed that the side agreement already obligated Concours to construct a new facility by that date, then the addendum would have been unnecessary.

Endeavoring to show that Concours understood the side letter as a binding commitment to construct the facility, MBUSA points to the fact that Concours, in its October

12

6, 2005 letter, stated that the side letter required MBUSA to grant Concours a new five-year dealer agreement upon Concours' commencement of construction. But this shows only that Concours understood that MBUSA was required to grant Concours a five-year agreement once it commenced construction of the new facility, not that Concours was absolutely required to commence construction. In fact, had Concours commenced construction of a facility in accordance with plans approved by MBUSA, and had MBUSA thereafter refused to grant it a five-year dealership, MBUSA would have been in breach of the agreement and potentially liable for Concours' reliance damages. See Skycom Corp. v. Telstar Corp., 813 F.2d 810, 817-18 (7th Cir. 1987) (stating that, under Wisconsin law, "[e]ven when a contract fails to become effective as a whole, particular terms may bind under the doctrine of promissory estoppel."). But because the parties could not agree on the remaining details, construction never began and the incentives of the side letter no longer applied. Thus, Concours was not required to commence construction, and MBUSA was not required to grant Concours a five-year dealership.

Accordingly, I conclude that Concours did not breach the side letter. However, even if it did, I would still grant summary judgment on MBUSA's breach of contract claim because the remedy elected by MBUSA – specific performance – is an inappropriate remedy. First, a request for specific performance will normally be denied "where the essential terms of the contract are not established with clarity." Krause v. Holand, 33 Wis. 2d 211, 214 (1967). See also TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 637 (7th Cir. 2007) (Illinois law) ("an order for specific performance is appropriate only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order"). In the present case, to order specific performance, I would have to supply all

13

of the essential details.  I would, for example, have to establish construction deadlines,
identify the requirements of a site for Concours to purchase, and determine whether
Concours' design reasonably satisfies MBUSA's facility criteria.

MBUSA suggests that I need not supply these details and need only order Concours
to do whatever it takes to get a new facility up and running by a certain date.  But this leads
to the second problem with specific performance – judicial supervision of an ongoing (and
likely acrimonious) relationship.  See Walgreen Co. v. Sara Creek Prop. Co., B.V., 966
F.2d 273, 276-79 (7th Cir. 1992) (applying Wisconsin law and explaining that specific
performance is disfavored where it involves ongoing judicial supervision of the parties'
relationship rather than a "one-shot remedy"); McKnight v. Gen. Motors Corp., 908 F.2d
104, 115-16 (7th Cir. 1990) (Wisconsin law) ("Courts do not want to involve themselves in
the industrial equivalent of matrimonial squabbling. They do not want to be involved in the
continuous supervision of a personal relationship that may last for many years."); E.L.
Husting Co. v. Coca-Cola Co., 205 Wis. 356 (1931) (noting that court is unlikely to award
specific performance where it would require court to supervise a continuing contract).  See
also TAS Dist. Co., 491 F.3d at 637 (applying Illinois law and noting that "specific
performance is rarely an appropriate remedy where such a grant would mandate ongoing
supervision by the court").  If I ordered Concours to open a new facility on or before a given
date, I would likely have to referee dozens of subsequent disputes.  For example, in
response to the question of how much money Concours must spend on a new facility,
MBUSA answers "the amount of money necessary for Concours to comply with its
contractual obligations."  (Br. in Opp. [Docket Entry 113] at 17.)  One can imagine that
Concours' view of what constitutes such an amount will differ from MBUSA's, and that

14

ultimately I will be asked to resolve this dispute. Similarly, MBUSA points out that the design of the facility should be controlled by the dealer agreement, MBUSA's dealership facility manual, and "such other standards as MBUSA may establish from time to time, including standards with respect to space, layout, equipment and appearance." (Id. at 16-17.) Again, the parties' views on these matters will likely differ, and frequent judicial intervention will be needed to resolve disputes.

Finally, there is a danger that the cost to Concours of constructing a new Mercedes-Benz facility would outweigh any benefit that the facility would provide to the parties or the public. That is, it is possible that Concours' breach (if it was one) was an "efficient breach," which the law does not want to deter, and that therefore MBUSA's remedy should be damages (which MBUSA has waived) rather than specific performance. See Walgreen Co., 966 F.2d at 274; Patton v. Mid-Continent Sys., Inc., 841 F.2d 742, 750-51 (7th Cir. 1988) (Indiana law). In the present case, MBUSA has not presented any evidence showing that the benefits of constructing the new facility would outweigh the costs. And even if constructing the new facility would be the most efficient use of resources, the need to supervise the construction process and supply all of the essential details, as described above, is reason enough for denying specific performance. Therefore, MBUSA's motion for partial summary judgment will be denied, and Concours' motion for summary judgment will be granted.[4]

---

[4]In a footnote, MBUSA points out that Concours has not moved for summary judgment on MBUSA's promissory estoppel claim. (Br. in Opp. [Docket Entry #113] at 1 n.1.) However, MBUSA does not state that it wishes to pursue the promissory estoppel claim. In any event, MBUSA has waived any entitlement to damages, and I would not award specific performance in connection with the promissory estoppel theory any more than I would award it in connection with the breach of contract claim. Therefore, summary

15

**B.      Concours' Counterclaims**

I next turn to MBUSA's motion for summary judgment on Concours' counterclaims.

MBUSA first argues that Concours released these claims when it when it signed the 2004

dealership agreement, which contained the following provision:

> Each party hereby releases the other from any and all claims and causes of
> action that it may have against the other for money damages arising from
> any event occurring up to and including the effective date of this Agreement
> . . . . This mutual release does not extend to claims that either party does
> not know or reasonably suspect to exist in its favor as of the effective date
> of this Agreement . . . .

(Kelso Decl. [Docket Entry #103] Ex. 4.)  The effective date of the agreement was January

1, 2004.  However, Concours' claims did not accrue until after this date.  The only damages

that Concours could have suffered as a result of MBUSA's actions were the costs of

acquiring the Brown Deer site and the architectural fees spent on designing the new

Mercedes-Benz facility.  Concours did not incur these damages until after January 1, 2004,

and therefore Concours could not have released its claims seeking such damages by that

date.

MBUSA also argues that Concours executed an identical release that had an

effective date of January 1, 2007.  However, Concours did not sign a written dealership

agreement having an effective date of January 1, 2007.  Rather, the last written agreement

between the parties expired on December 31, 2006, and the parties have been doing

business without a written dealer agreement since that time.  In its counterclaim, however,

Concours alleged that the parties began operating under an implied oral agreement as of

January 1, 2007, and that the terms of such agreement "mirror" the terms of the expired

judgment will be granted as to this claim, as well.

written agreements. (Countercl. [Docket Entry #59] ¶ 38.) MBUSA argues that by alleging that the terms of the implied oral agreement mirror the terms of the written agreements, Concours has pleaded that the implied oral agreement contains the same mutual release as the expired written agreements.

Although Concours probably wishes it had drafted its counterclaim differently, I do not view its allegation that the terms of the implied oral agreement "mirror" the terms of the written agreements as an admission that the oral agreement contains a fresh release of all claims against MBUSA. The verb "mirror" can mean "resemble," which in turn can mean "to be like or similar to." See Merriam-Webster's Online Dictionary, http://www.m-w.com (entries for "mirror" and "resemble") (last viewed Dec. 28, 2009). Thus, all that Concours may have alleged is that the implied oral agreement was similar, but not necessarily identical, to the written agreements. Further, Concours submits an affidavit in which it states that it did not enter into any oral agreement containing a release of its claims against MBUSA. (W. Wuesthoff Aff. [Docket Entry #125] ¶ 2.) Thus, whether the 2007 implied oral agreement contains the same release as the expired written agreement is an issue of fact that cannot be resolved at the summary judgment stage.

MBUSA argues that even if Concours has not released its claims, summary judgment is warranted because the claims fail on their merits. I thus turn to the merits of Concours' counterclaims. In doing so, I note that Concours has asserted no fewer than fourteen distinct claims. (Br. in Opp., table of contents.) The sheer number of claims is remarkable in its own right, but this number is even more remarkable given that all fourteen claims seem to be aimed at recovering the exact same damages: the amount of money

17

that Concours sunk into developing the stand-alone Mercedes-Benz facility.[5] Because the damages are the same regardless of the legal theory, Concours could have chosen its best two or three claims and developed them in detail. However, Concours has eschewed this course in favor of a scattershot approach.

As other courts have noted, a scattershot approach to litigation is usually unwise. See, e.g., Pitsonbarger v. Gramley, 141 F.3d 728, 734 (7th Cir. 1998); Gagan v. Am. Cablevision, Inc., 77 F.3d 951, 955 (7th Cir. 1996); Max M. v. New Trier High School Dist. No. 23, 859 F.2d 1297, 1300 (7th Cir. 1988). Such an approach sends the message that counsel does not think much of any of the claims raised, Max M., 859 F.2d at 1300, and runs the risk of "obscuring significant issues by dilution," Gagan, 77 F.3d at 955. In the present case, Concours' scattershot approach has indeed obscured any significant issues that may lie within the presentation of its claims. Having chosen to pursue fourteen alternative claims aimed at the same pool of damages, Concours devotes little more than a few paragraphs of its brief to any single claim. Further, the few paragraphs devoted to each claim contain haphazard lists of factual statements and legal propositions rather than crisp legal arguments. The result is that I have found it difficult to identify the legal theory underlying each claim. Nonetheless, I have attempted to decipher Concours' arguments without spending an inordinate amount of judicial resources on the task. I think I have been able to grasp most of the arguments, but as noted below, some arguments are so underdeveloped that I have had to conclude that Concours has forfeited them. See United States v. Kirkland, 567 F.3d 316, 322 (7th Cir. 2009) (stating that "[c]ourts are not in the

---

[5]I say "seem" because, as will be discussed, some of Concours' claims are not explicitly connected to any economic loss.

18

business of formulating arguments for the parties," and that they "need not try to imagine every plausible argument that could be extracted from an attorney's comments"); Harper v. Vigilant Ins. Co., 433 F.3d 521, 528 (7th Cir. 2005) (holding that arguments not properly developed in response to motion for summary judgment are waived). With these initial remarks in mind, I turn to Concours' claims.

### 1. Wisconsin Motor Vehicle Dealer Law

Concours alleges multiple violations of the Wisconsin Motor Vehicle Dealer Law ("WMVDL"), Wis. Stat. §§ 218.0101 - 218.53, which was enacted in 1935 in response to perceived abuses of dealers by auto manufacturers. Forest Home Dodge, Inc. v. Karns, 29 Wis. 2d 78, 85 (1965). The law is "designed to protect motor vehicle dealers from unfair treatment by manufacturers who are in a stronger bargaining position than dealers and to give dealers remedies against the manufacturer." Racine Harley-Davidson, Inc. v. State Div. of Hearings and Appeals, 278 Wis. 2d 508, 599 (2006). It guards against "specific evils occasioned by what the legislature considered the unfair or overreaching tactics of manufacturers, e. g., forced acceptance of unordered autos or parts; coercion or unfair treatment through threat of cancellation; [and] unfair cancellation or refusal to renew franchises . . . without due regard to the equities of the dealer." Forest Home Dodge, 29 Wis. 2d at 85 (citations omitted). Although the WMVDL is enforced administratively by the state department of transportation, the law also allows a dealer that has suffered "pecuniary loss" as a result of a manufacturer's (or, as here, a distributor's) violation to bring a civil action for damages, costs and reasonable attorneys' fees. Wis. Stat. § 218.0163(1). In the present case, Concours alleges that numerous violations by MBUSA

caused it to suffer pecuniary loss, as discussed below.

### a. Using threat of termination to coerce Concours into performing an unfair act

Concours first argues that MBUSA violated Section 218.0116(1)(hm), which prohibits a distributor from using the threat of termination to induce or coerce a dealer into either entering an unwanted agreement or "do[ing] any other act unfair to the dealer." Concours argues that MBUSA used the threat of termination to coerce it into building an exclusive Mercedes-Benz facility, which was an unfair act, and that this caused it to incur pecuniary harm in the form of the losses it suffered when it abandoned the project.

The problem with this claim is that Concours has produced no evidence from which a reasonable fact-finder could conclude that Concours' decision to pursue the new facility was the product of coercion. Concours points to no explicit threats by MBUSA to terminate the dealership unless Concours built the new facility. Although Concours points to various letters in which MBUSA threatened to terminate the dealership unless Concours corrected alleged deficiencies, those deficiencies involved sales performance, not inadequate facilities. For example, in its letter of April 3, 2003, MBUSA threatened to terminate the dealership, but that threat related to Concours' failure to meet the sales objectives in the Dealer Improvement Addendum. On August 8, 2003, MBUSA again wrote to Concours and expressed concerns over its failure to meet sales objectives. Although this letter also discussed the adequacy of Concours' existing facility, the letter acknowledged that the facility met the minimum requirements of the dealer agreement and did not threaten to terminate the dealership unless Concours built a new facility. MBUSA wrote to Concours again on November 11, 2003, and again threatened termination unless Concours improved

its sales, but once again MBUSA did not state that it would terminate the dealership if Concours refused to build new facilities.

Although Concours might argue that these letters, taken together, could be viewed as an implicit threat to terminate unless Concours built the new facility, Concours has not shown that these implicit threats resulted in actual coercion that culminated in "pecuniary harm." Wis. Stat. § 218.0163(1). This is so because Concours has not submitted evidence that would allow a reasonable fact-finder to conclude that Concours was opposed to building the new facility in the first place. Although Concours has submitted 130 proposed findings of fact in opposition to MBUSA's motion for summary judgment and responded to seventy-seven of MBUSA's proposed findings, Concours has not submitted a single proposed finding of fact in which it unequivocally states that it was opposed to building the new facility. Moreover, in its cover letter to the side letter, Concours stated that it was "willing to agree that it would be desirable to substantially upgrade [its] facility." (Wuestoff Aff.[ Docket Entry #97] Ex. A.) Concours has not submitted an affidavit or other evidence stating that it made this statement only to appease MBUSA and ward off termination. Thus, the only conclusion supported by the record is that, at the time Concours agreed to begin investing in the new facility, it had not been coerced into doing so.[6]

Although Concours does not dispute that it desired to build a new facility, it suggests

---

[6]After Concours abandoned its plans to build the stand-alone facility, MBUSA sent Concours a letter indicating that it was "unlikely" that it would renew Concours' dealership unless Concours decided to continue with the facility. (Beilfuss Aff. [Docket Entry #118] Ex. 42.) This could reasonably be construed as a threat to terminate the dealership if Concurs did not build the new facility. But this threat did not cause Concourse to continue with the project and thus did not result in either coercion or pecuniary harm.

that pressure from MBUSA caused it to choose the Brown Deer site as the location for the new facility rather than some other site.   (Add'l Prop. Findings of Fact [Docket Entry #114] ¶¶ 55-59.)  However, Concours produces no evidence from which a reasonable fact-finder could conclude that MBUSA pressured it to purchase the Brown Deer site.  Concours does not submit a proposed finding of fact suggesting that MBUSA instructed Concours to purchase the Brown Deer property over its objection.  Rather, Concours states that the Brown Deer site was not its "first choice," that it was the "best location immediately available in the beginning of 2004," and that Concours "felt" that it had no option but to purchase the property.  (Wuesthoff Aff. ¶ 9.)  Concours submits no evidence from which a reasonable fact-finder could conclude that it was reasonable for Concours to have "felt" that it was required to purchase the property.  Although Concours states that it felt pressure as a result of "the letters sent to Concours the year before," those letters preceded the December 19, 2003 side letter, in which Concours rejected MBUSA's unrealistic timeframe and counter-proposed that it locate a site by September 30, 2004.  Concours does not explain why it was reasonable for it to have felt compelled to purchase the Brown Deer site immediately at the beginning of 2004 when it had until September 2004 to do so by virtue of its own proposal.  Thus, no reasonable fact-finder could conclude that it was reasonable for Concours to have felt pressured to purchase the Brown Deer site, much less that MBUSA threatened to terminate the dealership if Concours did not purchase it.

Finally, I note that my finding that Concours was not the victim of coercion is consistent with the purposes of the WMVDL.  As noted, the WMVDL is designed to prevent manufacturers and distributors from exploiting their superior bargaining power.  Forest Home Dodge, 29 Wis. 2d at 85 (noting that WMVDL is a recognition of "the gross disparity

of bargaining power between the manufacturer of automobiles and the local retailer"). In the present case, the record establishes that Concours was not the victim of superior bargaining power and was able to hold its own in negotiations. When MBUSA included provisions in the dealership agreements requiring Concours to construct a new facility, Concours refused to sign them and counter-proposed that the parties enter into the side letter regarding the establishment of a new facility. Later, when MBUSA again asked Concours to sign an addendum to the dealer agreement requiring Concours to complete the new facility by December 31, 2006, Concours refused. When MBUSA learned that Concours had decided to abandon its plans for the Brown Deer facility, MBUSA stated that unless Concours changed its mind and continued with the project MBUSA was unlikely to renew Concours' dealership when it expired at the end of 2006. Nonetheless, Concours refused to continue with the project and proceeded to sell the Brown Deer property. Yet, to this day, MBUSA has not terminated Concours' dealership or taken any other punitive action that resulted in pecuniary harm. Thus, the record indicates that Concours was able to protect its own interests during negotiations.

In short, because Concours has not demonstrated that a reasonable fact-finder could conclude that Concours was coerced into building a stand-alone Mercedes-Benz facility, MBUSA's motion for summary judgment on this claim will be granted.

### b. Unfair cancellation or failure to renew dealership

Concours next alleges that MBUSA violated Wis. Stat. § 218.0116(1)(i), which prohibits the cancellation of a dealership if such cancellation was done "unfairly, without due regard for the equities or without just provocation." Although Concours continues to

23

operate as a MBUSA dealer, there is no written dealership agreement covering the parties'
relationship. Concours contends that this constitutes an unfair cancellation or failure to
renew. However, even if the lack of a written agreement is a violation of the WMVDL,
Concours has not pointed to any "pecuniary loss" caused by this violation. Wis. Stat.
§ 218.0163(1). Concours has not suggested that the lack of a written agreement has had
any effect on its operations; to the contrary, it has admitted that its operations have
continued unchanged and uninterrupted despite the expiration of the written agreements.
(Resp. to MBUSA Prop. Findings of Fact [Docket Entry #115] ¶¶ 31-34.) Therefore,
MBUSA's motion for summary judgment as to this claim will be granted.

### c. Arbitrary actions

Concours next argues that MBUSA violated Wis. Stat. § 218.0116(1)(x), which
prohibits a distributor from treating a dealer in an arbitrary manner. The parties' agree that
an arbitrary action is one that is irrational. See Glacier State Distrib. Servs., Inc. v. Wis.
Dep't of Transp., 221 Wis.2d 359, 369-70 (Ct. App.1998).

Concours alleges that MBUSA acted irrationally in three respects. First, it alleges
that MBUSA's projections as to how much showroom space Concours would need to meet
the expected demand for Mercedes-Benz vehicles over a five-year period (2004-08) was
irrational, and that this irrational act contributed to the costs that Concours incurred in
connection with the new facility. However, the MBUSA employee who generated these
projections explained the method that he employed in arriving at them, which was to take
the national average for sales and increase that number by 40% (the amount that MBUSA
expected sales to increase over the next five years), and then enter that number into a

computer program, which in turn would estimate the amount of space needed to support those sales. Although Concours would have preferred MBUSA to have used regional averages rather than national averages and thinks that the 40% growth estimate was unrealistic, Concours has not submitted evidence showing that it was irrational for MBUSA to have used these figures. Concours points out that MBUSA's internal projections showed that the Chicago region (the region encompassing Concours) would lose sales between 2003 and 2004, but this does not mean it was irrational for MBUSA to think that Concours could do better than the regional average or that, despite lower sales in the region in 2004, Concours would still experience 40% growth by 2008. Finally, although Concours notes that MBUSA has revised its projections regarding Concours' sales downward over time, this does not mean that the initial projections were irrational when made.

Second, Concours argues that it was irrational for MBUSA to fail to inform Concours, prior to the time it purchased the Brown Deer property, about its negotiations with International Autos regarding a third Milwaukee-area dealership. However, Concours does not actually attempt to show that this action was irrational. Indeed, Concours concedes that MBUSA had a rational basis for its decision – namely, to avoid the possibility that Concours would abandon its plans to build the new facility. In Concours' view, MBUSA's failure to inform it about the third dealership was unfair and sharp dealing. If it was sharp dealing, MBUSA may be liable for breach of the implied covenant of good faith and fair dealing, see infra, Part II.B.2, but that does not translate into a violation of Section 218.0116(1)(x).

Finally, Concours argues that MBUSA acted arbitrarily in holding Concours to the Chicago region performance standards. Essentially, Concours argues that the Wisconsin

25

market is different than the rest of the Chicago region and that MBUSA should take this into account when deciding whether Concours' sales are adequate. In a related argument, Concours argues that MBUSA enforces its standards in an arbitrary manner. However, whether or not MBUSA's performance standards are rational, and whether or not MBUSA enforces them consistently, Concours has not suggested that MBUSA's imposition or enforcement of those standards caused Concours any pecuniary harm. Despite Concours' failure to meet MBUSA's performance expectations, Concours continues to operate as a Mercedes-Benz dealer, even though it does not have a written dealership agreement. As explained above, Part II.B.1.b, Concours has not suggested that the lack of a written dealership agreement resulted in pecuniary harm. Accordingly, MBUSA's motion for summary judgment as to Concours' WMVDL claims will be granted.[7]

### 2.    Implied Covenant of Good Faith and Fair Dealing

Concours claims that MBUSA breached the implied covenant of good faith and fair dealing. The parties agree that New Jersey law applies to Concours' contract claims, including the breach of the implied covenant of good faith claim. Under New Jersey law, "[a] covenant of good faith and fair dealing is implied in every contract." Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001). This implied covenant is breached where a party to a contract "exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." Id. at 1130. Stated differently, the covenant is

---

[7]In a related argument made under the Auto Dealer's Day in Court Act, Concours hints at the possibility that the performance standards played a role in Concours' decision to invest in the new facility. I address this possibility below, Part II.B.4.

breached where one party attempts to intentionally deprive the other party of the benefits it reasonably expects to receive under the contract. Thus, to establish a breach of the implied covenant, a plaintiff must show that: (1) the parties have entered into a contract, (2) the defendant's conduct destroyed plaintiff's reasonable expectations under that contract, and (3) the defendant engaged in such conduct with a "bad motive or intention" – that is, with knowledge that its actions would deprive the plaintiff of the benefit of his bargain. See id. at 1130-31.

An example of the kind of conduct that constitutes a breach of the implied covenant of good faith appears in Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd., 970 F.2d 273 (7th Cir. 1992), which the New Jersey Supreme Court has cited with approval, see Wilson, 773 A.2d at 1130. "Suppose A hires B to paint his portrait to his satisfaction, and B paints it and A in fact is satisfied but says he is not in the hope of chivvying down the agreed-upon price because the portrait may be unsaleable to anyone else." Original Great American Chocolate Chip Cookie Co., 970 F.2d at 280. In this example, A breached the implied covenant of good faith under New Jersey law because he acted with the "bad motive or intention" of depriving B of his reasonable expectations under the contract – namely, the agreed-upon price for a satisfactory portrait. As this example illustrates, the essential purpose of the implied covenant of good faith is to prevent one party to the contract from acting opportunistically and appropriating the value owed to the other party under the contract. Id. See also Market Street Assocs., Ltd. P'ship v. Frey, 941 F.2d 588, 595 (7th Cir. 1991) ("The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of [the] rule.").

27

In the present case, Concours does not explain the legal theory underlying its implied covenant of good faith claim with any kind of precision. From reading its brief, I can tell that Concours believes that it was unfair for MBUSA to have encouraged Concours to build a new facility while failing to disclose that MBUSA was also encouraging International Autos to open a third Milwaukee-area Mercedes-Benz dealership. Concours also alleges that a number of MBUSA's other actions were taken in bad faith. (Br. in Opp. at 34.) However, as explained above, a breach of the implied covenant of good faith requires more than simply unfair conduct or actions taken in bad faith, it requires that the defendant engage in those actions with an intent to deprive the plaintiff of its reasonable expectations under the contract. And Concours does not explain how the evidence supports an inference that MBUSA intended to deprive it of its reasonable expectations under the contract. Indeed, Concours does not even identify the contract it is talking about (although presumably it is talking about the dealership agreement rather than the side letter), much less try to identify what it believed were its reasonable expectations under that contract. Having failed to identify its reasonable expectations, I cannot conclude that a reasonable fact-finder could infer that MBUSA engaged in conduct designed to deprive Concours of those expectations.

Concours cites Bak-A-Lum Corp. v. Alcoa Building Products Corp, in which the New Jersey Supreme Court found that a manufacturer had breached the implied covenant of good faith when it knew that its distributor was about to sign a five-year lease on a warehouse for storing the manufacturer's products but failed to tell the distributor that its exclusive distributorship was about to be terminated. 351 A.2d 349, 352 (N.J. 1976). After the distributor signed the lease, the manufacturer terminated the exclusive distributorship,

28

rendering the lease worthless.

Concours argues that it is in the same position as the distributor in Bak-A-Lum. However, unlike the plaintiff in Bak-A-Lum, Concours has not explained how its reasonable expectations have been frustrated. Concours might argue that MBUSA encouraged Concours to build the new facility knowing that the third Milwaukee-area dealership would substantially undermine the sales Concours could expect to make from its new facility, causing Concours' investment in the new facility to go to waste. But Concours has not developed evidence supporting this argument. It does not, for example, propose as a finding of fact that the third Milwaukee-area dealership would have so undermined Concours' investment in its own new facility that the investment would have gone to waste. Indeed, Concours does not propose that the third dealership would have reduced the sales potential of the new facility at all.[8] Thus, Concours has not developed an argument that would support its claim for breach of the implied covenant of good faith, and therefore MBUSA's motion for summary judgment on this claim will be granted.

**3.    Breach of Contract**

Concours next argues that MBUSA breached several provisions of its 2002

---

[8]Concours does propose that had it known about the third Milwaukee-area dealership, or even the possibility of the dealership, it would not have purchased the Brown Deer site. ( Add'l Prop. Findings of Fact [Docket Entry #114] ¶ 73.) However, Concours does not explain why knowledge of the third dealership would have caused it not to purchase the Brown Deer site. If it was because Concours believed that the third dealership would have siphoned off so many sales that the new facility would have been worthless, then Concours needs to point to evidence showing that this belief was reasonable, such as expert testimony or internal MBUSA documents projecting a substantial drop in Concours' sales as a result of the third dealership. No evidence indicating the impact of the third facility on Concours' sales is cited in Concours' brief or in its proposed findings of fact.

dealership agreement with Concours. First, Concours argues that MBUSA breached several provisions of this agreement by failing to "reasonably approve" of Concours' Glendale facility. (Br. in Opp. at 35.) Concours does not explain the legal theory underlying this claim with precision. However, Concours seems to be arguing that MBUSA acted unreasonably when it requested that Concours construct a new facility. But as discussed above, Part II.B.1.a, Concours agreed with MBUSA that a substantial upgrade of its facilities was in order, and thus it is not clear why, in Concours' view, MBUSA's request amounted to a breach of contract. Because I am unable to decipher Concours' argument, MBUSA's motion for summary judgment as to this claim will be granted.

Second, Concours argues that MBUSA beached the dealership agreement by failing to employ "reasonable criteria" when evaluating Concours' performance. (Br. in Opp. at 36.) However, Concours does not identify any damages that it suffered as a result of this alleged breach. Although MBUSA did threaten to terminate Concours based on poor performance, it never followed through on its threat. Concours continues to operate as a MBUSA dealer to this day. It is true that Concours does not have a written dealership agreement with MBUSA, but as discussed, the lack of a written agreement has not caused Concours any economic harm. Therefore, MBUSA's motion for summary judgment as to this claim will be granted.

Finally, Concours argues that MBUSA breached the 2002 agreement by sending Concours various termination notices. However, no provision of the dealer agreement prohibits MBUSA from sending termination notices, and therefore this claim fails.

### 4.    Auto Dealer's Day in Court Act

Case 2:07-cv-00389-LA    Filed 01/04/10    Page 30 of 33    Document 140

Finally, Concours argues that MBUSA violated the Auto Dealer's day in Court Act ("ADDCA"), 15 U.S.C. § 1222. This statute is similar to the WMVDL, discussed above, in that it allows a dealer to bring an action for damages caused by a manufacturer or distributor's coercion. Concours argues that MBUSA violated the ADDCA in two respects. First, Concours argues that MBUSA violated the ADDCA by applying unreasonable performance standards to Concours. Concours obliquely suggests that MBUSA's application of these performance standards resulted in coercion that caused Concours to agree to invest in the new facility. (Br. in Opp. at 40.) But Concours has not submitted evidence from which a reasonable fact-finder could conclude that Concours agreed to pursue the new facility only to avoid termination for failure to comply with the performance standards. Not a single proposed finding of fact suggests that it was the performance standards that caused Concours to begin making plans to construct the new facility. Further, as already discussed, Part II.B.1.a, Concours has not offered evidence from which a reasonable jury could conclude that Concours was coerced into pursuing the new facility or purchasing the Brown Deer site. Thus, MBUSA's motion for summary judgment as to this claim will be granted.

Second, Concours argues that MBUSA forced Concours to comply with unreasonable facilities requirements, and that Concours' attempt to comply with those requirements caused it to invest in the new facility. Again, however, Concours has not produced evidence that would allow a reasonable fact-finder to conclude that Concours' decision to pursue the new facility was the result of coercion by MBUSA, and therefore this claim also fails.

31

**C.      Motions to File Under Seal**

One last housekeeping matter must be addressed.  The parties have filed a large amount of materials in support of their motions for summary judgment under seal, including entire briefs.  However, the public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding.  See, e.g., Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 945 (7th Cir. 1999).  Although that interest does not always trump the property and privacy interests of litigants, "it can be overridden only if the latter interests predominate in the particular case, that is, only if there is good cause for sealing a part or the whole of the record in that case."  Id.

In the present case, the parties have not demonstrated good cause for sealing the materials supporting their summary judgment motions.  Therefore, I will order the clerk of court to unseal all such materials unless, within fifteen days, the party seeking to preserve confidentiality files a statement explaining why the information contained in those materials should be kept out of the public record.  Blanket statements that the documents contain confidential business information will not do; rather, for each document, the party must identify the specific harm that might result from public disclosure and explain why that harm outweighs the public's interest in open court proceedings.  Further, even if a party succeeds in showing that a document should be removed from the public record, I will under no circumstances allow entire briefs and affidavits to be filed under seal.  Instead, the party must file a version of the brief, affidavit, or other filing in which the confidential information has been redacted and all other information is left accessible to the public.  An unredacted copy may then be filed under seal.

Case 2:07-cv-00389-LA    Filed 01/04/10    Page 32 of 33    Document 140

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that MBUSA's motion for partial summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Concours' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that MBUSA's motion for summary judgment on Concours' counterclaims is **GRANTED**.

**IT IS FURTHER ORDERED** that MBUSA's motion to for leave to file a brief in excess of the page limit is **GRANTED**.

**IT IS FURTHER ORDERED** that any party that wishes to preserve the confidentiality of any materials filed under seal must file a statement showing good cause for removing the materials from the public record within **15 DAYS** of the date of this order.

**FINALLY, IT IS ORDERED** the clerk of court enter final judgment.

Dated at Milwaukee, Wisconsin, this 4 day of January, 2010.


/s_____
LYNN ADELMAN
District Judge